BOBBIE HENRY,

     Plaintiff,

v.

OUTBACK STEAKHOUSE OF
FLORIDA, LLC, and OSI RESTAURANT
PARTNERS, LLC,

     Defendants.

Case No. 15-cv-10755
Honorable Laurie J. Michelson
Magistrate Judge Anthony P. Patti

---

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [43]

---

Plaintiff Bobbie Henry worked at the Flint, Michigan Outback Steakhouse from 1997 until 2014. She was also a licensed medical marijuana caregiver, and one of her patients was a coworker at the Flint Outback. In the process of investigating four other Flint Outback employees for suspected drug activity, several of Henry's coworkers told management that Henry was selling drugs on the restaurant premises. When interviewed, Henry admitted she had sold medical marijuana to a coworker. As a result of this investigation, Henry and five other employees were terminated. Though the other five employees who were terminated were younger than she was, Henry now alleges that her termination was motivated by age discrimination. After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2). Because Henry cannot raise a genuine issue of material fact as to whether Defendants' stated reason for termination—drug activity—was pretext for age discrimination, Defendants are entitled to summary judgment.

# I.

Before the Court summarizes the record evidence in the case, it must address a discovery issue. Several of the witnesses in this case failed to appear for their scheduled depositions (or evaded service of subpoenas), but have offered affidavits in support of Henry's allegations of age discrimination at the Flint Outback.[1] Specifically, Chad Vining avers that he was formerly employed at the Flint Outback and heard managing partner Christine Tate say that they "wanted young blood to work in the restaurant." (R. 49, PID 1412.) Kelana Fordham now denies making statements that Henry was selling drugs during an interview with management. (R. 49, PID 1403.) Similarly, Alex French now avers that she "never told [anyone on the management team] that Bobbie Henry was selling, buying, or using drugs while on the premises of Outback." (R. 49, PID 1408.) Defendants say that Henry should not be allowed to rely on these affidavits in her summary-judgment response because these witnesses failed to appear for their depositions even as they remained in contact with Henry, and Henry told at least one of these witnesses that she could "hide" from Defendants' process server who was attempting to serve a deposition notice. (R. 47, PID 1345, 1361; R. 50, PID 1450.)

Case law from this district supports this Court's authority to strike an affidavit from a witness who failed to appear for a deposition. In *Dedvukaj v. Equilon Enters., LLC*, 301 F. Supp. 2d 664, 668 (E.D. Mich. 2004), *aff'd*, 132 F. App'x 582 (6th Cir. 2005), the court struck the affidavit of a corporate officer of the Plaintiff, where that officer did not appear for a deposition. As a general matter, the court reasoned, "defendant was entitled to receive such evidence, and

---

[1] During a status conference with the parties where this issue of third party witnesses evading service was raised, the Court advised that it would give Defendant the opportunity to depose these witnesses prior to their trial testimony, even if it meant conducting the depositions when the witness appeared at trial. The specific issue of how to handle evading witnesses providing affidavits for one party for the purpose of summary judgment was not addressed.

digest it, during the discovery period prior to filing this summary judgment motion." *Id.* It would be "unreasonable to rely on affidavit 'evidence' from an individual who has made himself unavailable for discovery and for whom there is even no indication he will be available for trial," the court concluded. *Id.* The *Dedvukaj* court relied on Federal Rule of Civil Procedure 37(d), which allows a court to issue "orders in regard to the failure as are just" concerning the testimony of any "party or an officer, director, or managing agent of a party" who fails to appear for deposition.

Courts in this district have applied *Dedvukaj*'s reasoning to a situation where the non-appearing affiant was not an officer, director, or managing agent of a party. *See McKellar v. State Farm Fire & Cas. Co.*, No. 14-cv-13730, 2016 U.S. Dist. LEXIS 8613, at *21 (E.D. Mich. Jan. 26, 2016); *Bumpas v. Ryan*, No. 3:07-cv-0766, 2013 U.S. Dist. LEXIS 77507, at *6 (M.D. Tenn. June 3, 2013). The *McKellar* court reasoned that allowing such a witness to offer "unchallenged affidavit testimony . . . would clearly violate the purpose of discovery." *McKellar*, 2016 U.S. Dist. LEXIS 8613, at *22.

One court has distinguished *Dedvukaj*, reasoning that "[t]he affiant who did not appear for deposition in this case was a third party, not under subpoena or other Court process," whereas in *Dedvukaj*, "the witness (affiant) who did not appear was an officer of the plaintiff corporation[.]" *Airojet Charters, Inc. v. Catlin Ins. Co.*, No. 10-61671-CIV, 2011 U.S. Dist. LEXIS 159256, at *2 (S.D. Fla. June 9, 2011). Yet, *Airojet* does not help Henry: in that case, there were no allegations that the plaintiff had anything to do with the witness's failure to appear for deposition. *Id.* In this case, it does appear that Henry's conduct had something to do with Defendants' inability to depose the witnesses. During discovery, the Court held several phone conferences regarding Henry's contacts with French. During her deposition, Henry admitted to

sending the following text message to French: "I want you to know they [Defendants] are trying to serve you [with a deposition notice]. I promise it is not from my lawyer. He promised to leave you alone, so hide if you want to. Have a great day." (R. 43-3, PID 660.) And Henry also testified at her deposition that she exchanged text messages with Vining regarding his affidavit and promised she would "make it worth [his] while" by paying for the notary. (R. 43-3, PID 679.) Defendants inform the Court that in fact, they were unable to serve French, and Vining never appeared for his deposition. (R. 50, PID 1450.) And there is no indication that any of these three witnesses will voluntarily appear for trial, though it does appear that all three may live within this Court's subpoena power.

The Court is troubled by Henry's contact with non-party witnesses who provided affidavits, yet failed to appear for scheduled depositions or evaded service. On these facts, Henry had some control over these witnesses and seeks the benefit of their affidavits, yet defendants have been denied the ability to depose them. In this situation, where one party has been in continued contact with non-party affiants but the other party has been denied the ability to question their statements, the Court finds that *Dedvukaj*'s reasoning applies and the affidavits should be stricken. *See Englar v. 41B Dist. Court*, Civil Action No. 04-CV-73977, 2009 U.S. Dist. LEXIS 100949, at *14–15 (E.D. Mich. Oct. 29, 2009) ("To not permit the reconvening of Judge Cannon's deposition after he refused to answer questions at the first deposition, thereafter submitting two affidavits [offered in support of the plaintiff's case], would subvert the Court's obligation to ensure justice."). Accordingly, the Court will not consider the affidavits of Kelana Fordham, Chad Vining, and Alex French on summary judgment.

## II.

The Court now turns to the rest of the summary-judgment record. Where there are disputes, the Court views the facts in the light most favorable to Henry, the non-moving party.

### A.

Plaintiff Bobby Henry has worked in the restaurant industry since 1984. (*Id.* at PID 429.) In 1996 or 1997, she started working at the Flint, Michigan location of Outback Steakhouse. She worked as a server, bartender, and "bar rep," doing the ordering and end-of-the-month supply counts. (*Id.* at PID 433.) Around the time of her termination, Henry was working as a bartender, but had moved to day shifts and would serve some tables as well. (R. 43-2, PID 447–48.) Henry says that she did well as an employee, citing an undated certificate for "Top Performing Bar Team." (R. 49, PID 1427) and a note from Steve Rossi "express[ing] [his] appreciation on the exemplary comments we received from a grateful customer." (R. 49, PID 1429.) In November 2014, at age 48, Henry was terminated. (*Id.*) She filed this lawsuit, alleging that she was terminated because of her age. (R. 43-2, PID 433.)

Henry says that in November 2012, when Christine Tate took over as managing partner, the environment at the Flint Outback changed. (*See* R. 43-2, PID 434.) (Even so, during that time, Henry recommended that a high school friend, Michelle Edmonds, apply to work at Outback, calling it a "great place to work." (R. 43-12, PID 1154.)) As managing partner, Tate was responsible for the hiring and firing of hourly employees. (R. 43-4, PID 714.) Assisting Tate during Henry's last year of employment at Outback was the manager for the Flint Outback, Toriano ("Tory") Vancobb, and the restaurant's kitchen manager, Brian Gudzik. (R. 43-7, PID 884, R. 43-8, PID 979.) In turn, Tate reported directly to Jennifer Szewc, who is the joint-venture

partner responsible for overseeing the Detroit-area Outback Steakhouse restaurants. (R. 43-6, PID 815.)

Henry said that, after Tate took over, her shifts changed and she thought perhaps it was "[b]ecause I had been there for so long. Maybe they figured my age, I'm not a hundred percent. All I know is I was treated differently than the other younger employees who were doing the same job I was." (R. 43-2 PID 453.) For example, there was an incident where Henry was required to purchase a certain type of slip-resistant shoe for work while the rule was not enforced for younger employees. (*Id.*) In her response brief, Henry says that her pay rate was also decreased without explanation, but she does not cite any evidence in the record to support that assertion.

Michael Aplin avers that he was employed at the Flint Outback for approximately one year and quit because he felt management was being disrespectful to him because of his age (he is now "fifty plus" but his affidavit does not specify how old he was when he worked at Outback), that Tate and Vancobb would make "old people jokes," and that Henry was denied assignments in favor of younger employees, though he did not specify exactly what those assignments were. (R. 49, PID 1432.) Aplin elaborated on these statements at his deposition. He said that Vancobb would call him "old man," and call Henry an "old timer, old lady." (R. 43-11, PID 1062.) He thought that Vancobb did this because he "really did think he was being funny." (R. 43-11, PID 1064.) He testified that management "suddenly started asking every 21-year-old girl there . . . if they wanted to bartend, people that had never bartended before, and within a week they were working Friday and Saturday nights, which used to be Bobbi's shifts." (R. 43-11, PID 1068.) It seems, however, that Henry asked to be put on the daytime shift: "[T]hey needed a daytime bartender because nobody else would do it. So, I said—I went to the manager

and asked if I could just be the daytime bartender and still take tables and he informed me that is what they had planned for me." (R. 43-2, PID 447–48.) Similarly, Michelle Edmonds testified that Vancobb called her "grandma"—but in a joking manner. (R. 43-12, PID 1166.) Finally, Davonte Smith testified that Christine Tate "had it out" for Henry, not because of her age, but because she had been working there for longer than other employees. (R. 43-10, PID 1028.)

## B.

What ultimately led to Henry's termination was a "conduct unbecoming" investigation of several other Flint "Outbackers." On November 16, 2014, Gudzik (the kitchen manager) observed employees Corey Avant and Mariah Nash exchange money for a "small black object," which the two later claimed was a bridge card. (R. 43-7, PID 910–19; 43-8, PID 990.) Shortly thereafter, Gudzik observed Avant exit the restaurant and exchange a small package with another employee, Kelana Fordham. (R. 43-7, PID 914; R. 43-8, PID 981.) Around that time, Vancobb saw Trressa Moore exchange money with Avant. (R. 43-7, PID 915.) Vancobb was unsure the purpose of the exchange between Moore and Avant. (R, 43-7, PID 916.) Moore later said that Avant needed change. (R. 43-7, PID 915.) Gudzik's suspicion, however, was that the exchanges had something to do with drugs. (R. 43-8, PID 979.) Henry asserts that she was not on the premises for these events or the three days afterward. (R. 49, PID 1385.)

On November 18, 2014, Tate, Vancobb, Gudzik, and Szewc, had a conference call with Ladonis Toney-Pierce, Outback's Employee Relations Manager. (R. 43-8, PID 979.) After hearing a description of the activity of November 16, Toney-Pierce recommended to terminate all four employees—Avant, Nash, Fordham, and Moore. (R. 43-8, PID 979.) Those employees were ultimately terminated, but the management team first gave them the opportunity to meet

with management and explain the activity. (R. 43-8, PID 991.) Their interviews implicated Henry.

Gudzik initially testified that during those interviews, "The four Outbackers [who were terminated] had said that Bobbi was selling drugs to the staff and to the customers." (R. 43-8, PID 991.) Later, however, he clarified that he only remembered that Fordham had said Henry was selling drugs. (*Id.* at PID 994.) Vancobb said that only Fordham mentioned that Henry was selling drugs (though it is unclear whether he was present for all of the interviews), and that Fordham became "emotional" during her interview: "I don't remember every word she used, but pretty much, I can't believe that I'm getting fired for this when Bobbie is dealing dope behind the bar, Dave's passing out candy to everybody who works." (R. 43-7, PID 928.)

As a result of this new information, the management team conducted additional interviews—fifteen, according to Tate. (R. 43-7, PID 921; R. 43-5, PID 782.) Tate testified that two additional employees, Alex French and Kelsie Corbray, stated that Henry was selling marijuana on the restaurant premises. (R. 43-5, PID 783; R. 43-7, PID 923.) Thus, Tate said, in taking subsequent action on Henry, she relied on reports from French, Corbray, and Fordham. (R. 43-5, PID 783.) It does not appear that anyone took notes during the interviews—Tate said she did not take notes, and was not sure whether Gudzik and Vancobb had either. (R. 43-5, PID 773.) No notes appear in the record.

## C.

On November 20, 2014, Szewc attended a previously-scheduled meeting with other managers in the region. (R. 43-6, PID 818.) Toney-Pierce participated by phone. (R. 43-6, PID 817.) The Flint management team explained to Szewc and Toney-Pierce the situation with Henry and that they were still following up with the employees, and they would update her after that

was done. (R. 43-6, PID 818.) Szewc stated, "We had some very clear conversation with Ladonis about [Henry's] tenure because she was the most tenured individual out of that entire group. . . . [A] 17-year career in a company, we take pride in that. And we don't take that lightly." (R. 43-6, PID 819.) Thus, Szewc testified, "We hadn't decided anything at the time of the conversation." (*Id.*) But Gudzik testified that even in light of the ongoing nature of the investigation, a decision was made that morning that because at least two people had made a statement that Henry was selling drugs on the restaurant premises, she should be terminated. (R. 43-8, PID 994.) That is, the management team had the "go-ahead, to support the decision to fire her, after they had talked to Bobbi." (R. 43-8, PID 995.) Szewc stated that she would not say that Gudzik was "not correct. I know that they were given direction by Ladonis to follow up with some conversations in the restaurant. We had—that wasn't the only time they had talked to Ladonis." (R. 43-6, PID 820.) In any event, it appears that the decision that Henry should be terminated came from Toney-Pierce, after she heard the reports accusing Henry of drug activity from the Flint management team. Szewc testified that "the decision that [Toney-Pierce] had advised the team," which Szewc agreed with, was that Henry would be terminated because her name had been mentioned "on multiple occasions." (R. 43-6, PID 829.) Gudzik confirmed that Toney-Pierce was the one to indicate that Henry was to be terminated. (R. 43-8, PID 994.) Tate stated that the parties to the meeting were "Jen [Szewc], Ladonis [Toney-Pierce], myself, . . . Tori [Vancobb], Brian [Gudzik]." (R. 43-4, PID 740.)

Tate and Vancobb confronted Henry later that day at the restaurant. (R. 43-7, PID 932.) Tate testified that Henry got upset while being questioned: "She talked about having a medical marijuana card. She talked about having—so it was legal for her to sell or possess. Davonte [Smith] was her patient. She never sold drugs in Outback or on Outback property. And a couple

times reiterated that Davonte was her patient, so that it was okay for her to supply him with marijuana." (R. 43-7, PID 937.)

Henry also recalled that meeting at her deposition. She testified that the first time she heard that someone suspected her of selling marijuana on the premises was the day she was terminated. (R. 43-2, PID 481.) On that day, she was called into the office by Tate and Vancobb and was told that someone said she was "selling drugs to employees." (R. 43-2, PID 481.) She admitted that she had a medical marijuana card and that one of her patients was Davonte Smith, a fellow Outback employee. (R. 43-2, PID 482.) But she denied to Tate and Vancobb that she ever sold to Smith "at Outback." (R. 43-2, PID 482.) She said that she would sell to Smith in "[p]arking lots or my house." (R. 43-2, PID 482.)

Despite Henry's attempts to explain herself during the interview, she was terminated the same day. (R. 43-2, PID 481.) A note dated November 20, 2014, presumably typed by Tate, summarized the interview:

> [Henry] said she has never brought drugs to work or sold them on property. She said the only one that she did was Davonte because she is licensed to sell to him. I said what about things other than weed. Do you understand what 'illegal substances are' she said anything that isn't prescribed to you personally. I said yes. So have you ever tried to sell or buy any illegal substances. She said no. I said well, I am letting you go for conduct unbecoming an outbacker. She said Why? Because someone is saying I have? Davonte is legal. I said it isn't [D]avonte and its not just weed.

(R. 49, PID 1423.)

After she was terminated, Henry contacted several fellow employees and customers via text message and social media letting them know she had been terminated for selling drugs, but that it was "a lie." (R. 43-3, PID 636.) Henry later discovered that another employee, Dave King, had also been fired for selling drugs. (R. 43-2, PID 492.) King now avers that he told management that he denied ever selling drugs when talking to management. (R. 49, PID 1415.)

Henry also learned that four other employees had been terminated for "suspicious activity." (R. 43-2, PID 497.) She was the only one of the six who was over forty. (R. 43-2, PID 497.)

**D.**

Henry has a medical marijuana license and is currently licensed to grow marijuana and supply it to four "patients," Mich. Comp. Laws § 333.26424, Davonte Smith, herself, and two other individuals who do not appear to be Outback employees. (R. 43-2, PID 418.) Despite her statements at the meeting with Tate and Vancobb, Henry admitted at her deposition in this case that she had made an exchange of marijuana to Davonte Smith in the parking lot of the Flint Outback. (R. 43-3, PID 687–88.)

**III.**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party may discharge its initial summary judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

# IV.

## A.

Henry first asserts a claim of age discrimination pursuant to Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Michigan Compiled Laws § 37.2202(a). Prior to 2009, courts in this circuit analyzed age discrimination claims under the federal Age Discrimination in Employment Act ("ADEA") and ELCRA under the same standard, with the ultimate burden being proof that age was a "substantial" or "motivating" factor in the employer's decision. *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007). In *Gross v. FBL Financial Services*, 557 U.S. 167, 177–78 (2009), however, the Supreme Court held that "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor. . . . therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174, 129 S. Ct. 2343, 2349 (2009). "In contrast to the ADEA's 'but-for' causation burden, under the ELCRA a plaintiff must ultimately prove that the defendant's discriminatory animus was a 'substantial' or 'motivating' factor in the decision. *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011). Despite *Provenzano*, it appears that there may still be some question as to whether the motivating factor standard still applies to ELCRA claims. *Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 703 (6th Cir. 2016) ("[W]e need not decide today which causation standard applies to ELCRA claims because under either the but-for standard or the determining-factor standard, Richardson's age-discrimination claim fails.").

Regardless of the ultimate burden, the same analytical framework applies to both ADEA and ELCRA claims. *Provezano*, 663 F.3d at 818. Henry may attempt to prove her case using either direct or circumstantial evidence. Henry asserts that she has presented both.

# 1.

"Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was [the] motivating factor in the employer's actions. It does not require the fact finder to draw any inferences to reach that conclusion." *Sharp v. Aker Plant Servs. Grp.*, 726 F.3d 789, 798 (6th Cir. 2013) (citing cases); *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age, satisfy this criteria." *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) (citing *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)). In evaluating whether statements constitute direct evidence of age discrimination, the Court considers the following factors:

> (1) whether the statements were made by a decision-maker or by an agent within the scope of his employment; (2) whether the statements were related to the decision-making process; (3) whether the statements were more than merely vague, ambiguous or isolated remarks; and (4) whether they were made proximate in time to the act of termination.

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 478 (6th Cir. 2002). No factor is individually dispositive; rather, the Court evaluates the factors as a whole. *Id.* Henry says that the testimony and sworn statements of Chad Vining, Michael Aplin, and Michelle Edmonds regarding statements that Vancobb (restaurant manager) made qualify as direct evidence of age discrimination. (R. 49, PID 1390.)

Vining's affidavit has been stricken and will not be considered.[2]

---

[2] Even if the Court were to consider Vining's affidavit, it does not qualify as direct evidence of discrimination. He avers that he was formerly employed at the Flint Outback and heard Tate say that they "wanted young blood to work in the restaurant." (R. 49, PID 1412.) However, this comment is too vague to constitute direct evidence of discrimination. The Sixth Circuit rejected a similar "young blood" comment as direct evidence because there was no evidence of "to whom the comment was directed, why [the speaker] made the reference, when

As to Aplin and Edmonds, Aplin testified that Vancobb referred to Henry as "old timer, old lady" and referred to him as "old man." Edmonds testified that Vancobb called her "grandma" but "in a joking manner." (R. 43-12, PID 1166.) In Henry's favor, Aplin's and Edmonds' testimony implies that Vancobb's comments may not have been isolated remarks. However, while Vancobb was part of the management team and was present at the round-table meeting, all available testimony says that it was Toney-Pierce (the employee relations manager) who made the decision to terminate Henry. Further, it does not appear that Vancobb's comments were related to Vancobb's decision-making process or were made proximate in time to Henry's termination. Rather, Aplin and Edmonds both testified that they thought Vancobb thought that he was being funny. The Court therefore finds that Vancobb's statements, through the testimony of Aplin and Edmonds, do not constitute direct evidence of intent to discriminate against Henry based on age.

### 2.

"Circumstantial evidence . . . is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003) (citing *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). Where a plaintiff relies on circumstantial evidence, "the familiar analysis" from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) applies. *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 777 F.3d 303, 308 (6th Cir. 2015). Under this framework, Henry must first establish a prima facie case of discrimination. *See id.* If she succeeds, the burden then shifts to Outback "to articulate a legitimate nondiscriminatory reason for the adverse employment

---

such reference was made, or how frequently it was made." *DePas v. Stocker & Yale, Inc.*, 94 F. App'x 335, 340 (6th Cir. 2004). The same is true here.

action." *See id.* (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010)). Henry would then have the burden to "show that [Outback's] explanation was a mere pretext for intentional age discrimination." *See id.*

Here, though it is unclear whether Henry has even established a *prima facie* case,[3] the parties only dispute pretext.[4] Defendants argue that Henry was terminated for the following legitimate non-discriminatory reason: "distributing drugs to coworkers." (R. 43, PID 378.) Specifically, Defendants say that deposition testimony establishes that over the course of Tate's investigation of the activities of November 16, 2014, Tate received information from Kelana Fordham, Alex French, and Kelsie Corbray that Henry was selling drugs at the restaurant. Based on this information, the management team decided to terminate Henry's employment. What is more, when the team informed Henry of its decision, Henry admitted that she had a medical marijuana card and that one of her Outback coworkers was one of her patients.

Given that Defendants have articulated a legitimate non-discriminatory reason for firing Henry, she must show that the reason was a pretext for discrimination. *Tilley*, 777 F.3d at 307–08. She can do this "(1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision." *Dubey v. Stroh Brewery Co.*, 462 N.W.2d 758, 760 (Mich. Ct. App. 1990); *Ondricko v. MGM Grand Detroit,*

---

[3] Tate agreed that bartenders hired after Henry left were younger than Henry, but she did not clarify when those people were hired. (R. 43-4, PID 715.) And more specifically, Tate recalled that an "older" server/bartender named Hope took over Henry's bartending duties after she was terminated. (R. 43-4, PID 697.) And Aplin's testimony suggests that younger employees started taking bartending shifts on Friday and Saturday nights, but it is unclear when this happened.

[4] Defendants argued in their response brief that Henry's termination is the only "adverse employment action" at issue here (R. 43, PID 388), and Henry does not mention any "adverse employment action" other than termination in her response brief (R. 49, PID 1390).

*LLC*, 689 F.3d 642, 654 (6th Cir. 2012). However, with both federal age-discrimination claims and ELCRA, a business judgment rule applies: "The soundness of an employer's business judgment . . . may not be questioned as a means of showing pretext." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 898 (6th Cir. 1997) (analyzing a claim under ELCRA, quoting *Dubey v. Stroh Brewery Co.,* 462 N.W.2d 758, 760 (Mich. Ct. App. 1990)). That is to say, "An age discrimination action is not 'a device which permits the jury to examine an employer's reasons for discharge and determine that the employer's business judgment or policies do not appeal to its sensibilities.' The Elliott-Larsen Act proscribes discrimination, not unfair treatment." *Id.* (citations omitted).

Henry first argues that there is not "a single witness by deposition and/or affidavit to support the claim that Plaintiff sold any drugs at the restaurant or to any other Outbacker." (R. 49, PID 1393.) That is not accurate. Gudzik, Vancobb, and Tate all said that Fordham told them that Henry was selling drugs on the restaurant's premises. Tate said that two additional employees, Corbray and French, also stated that Henry was selling drugs. And Henry herself admitted to selling drugs to Davonte Smith (albeit not on the premises) when confronted by Tate and Vancobb. True, Henry's admission came after the decision to terminate her had been made. However, Szewc testified that even though an initial decision was made to terminate, the meeting with management could have changed things:

> Based on the information that Ladonis had, it was my understanding that that was the direction we were going to take. But once the team had talked to Bobbi, and if something would have come up, to be quite honest—in a fair hearing, if the individual, not just Bobbi, but anybody, maybe they have other things that they need to say, maybe there's other circumstances that the team didn't know about, maybe stuff comes out in conversation, and if they would have been in a position where it didn't follow Ladonis' advice, or legal counsel, if you will, at the time, then they probably would have stopped the conversation and called [Ladonis]. That's happened before.

(R. 43-6, PID 847.) When Henry was given this opportunity, though, Henry confirmed that she did have a medical-marijuana card and did sell marijuana to Smith, a fellow Outback employee. Though Henry denied selling marijuana on the restaurant premises, she admitted to selling a drug. So instead of giving management pause, Henry's comments in the interview actually confirmed the basis the management team already had for firing her.[5]

The fact that what Henry ultimately admitted in her meeting with management staff did not line up perfectly with the information gathered during the investigation does not render the proffered reason pretextual. "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Heiler*, 2016 U.S. Dist. LEXIS 1589, at *25–26. "The key inquiry is instead 'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590–91 (6th Cir. 2014). Here, the management team conducted fifteen interviews total and received three reports that Henry was selling drugs on the premises. Moreover, the management team involved high-level HR in the decision to terminate Henry. And after the decision to terminate Henry was made, Henry herself admitted to selling marijuana to a coworker in an interview (even though she denied selling on restaurant premises), which confirmed to some extent the allegations from Henry's coworkers. An "employer's pre-termination investigation need not be perfect in order to pass muster under the [honest belief] rule." *Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 707 (6th Cir. 2016) (quoting *Loyd*, 766 F.3d at 591).

---

[5] For this reason, the Court would likely still grant summary judgment even if it were to consider Fordham and French's affidavits.

Henry next argues that "Outback has no written drug policy that is applicable to [her]." (R. 49, PID 1391.) But Outback's Employee Handbook states, "The illegal use, sale, or possession of narcotics, drugs, or controlled substances while on the job or on Company property is strictly prohibited and is a dischargeable offense." (R. 47-2, PID 1369.) Though Henry had a Michigan medical marijuana card, "state medical-marijuana laws do not, and cannot, supercede federal laws that criminalize the possession of marijuana," and marijuana remains illegal under the federal Controlled Substances Act. *United States v. Hicks*, 722 F. Supp. 2d 829, 833 (E.D. Mich. 2010). Henry asserts that she never received this policy, but she acknowledged at her deposition that it is "common sense" that "you do not take drugs into work." (R. 43-2, PID 475.)

On a related note, Henry says that her sales to Smith cannot be a basis for the termination because Smith was her patient. But "the [Michigan Medical Marijuana Act] does not impose restrictions on private employers" and does not "provide[] protection against disciplinary actions" by an employer. *Casias v. Wal-Mart Stores*, 695 F.3d 428, 435 (6th Cir. 2012).

Henry also asserts that Tate told her that "drugs in the parking lot will not be a basis or reason for termination." (R. 49, PID 1391.) But Henry cites no record evidence for this assertion. Furthermore, the "conduct unbecoming" investigation (and related terminations) was in fact triggered by Gudzik's suspicion that Outbackers were exchanging drugs in the parking lot.

Lastly, Henry says that "younger employees were named for the same or similar conduct and Christine Tate admitted they were not fired." (R. 49, PID 1394.) This assertion is directly contradicted by the undisputed fact that Avant, Nash, Fordham, Moore, and King were all fired as a result of the same investigation, and they were all younger than Henry. Henry says that Alex French and an employee named "Chris" were named as participating in drug activity yet were never fired. But it appears that only one person, Fordham, implicated French and "Chris." (R. 49,

PID 1421.) In any event, French and Chris were not involved in the events of November 16, and neither admitted to selling or buying drugs on the restaurant premises. To the contrary, Vancobb said that Chris explained that he had a prescription for Vicodin for a back injury but that he was not "passing them out." (R. 43-7, PID 924.) In short, French and Chris were not similarly situated to Henry.

Perhaps Henry would respond that even though younger employees were also terminated, Vancobb's remarks show that as to her, the proffered reason was pretextual. *See Bartlett v. Gates*, 421 F. App'x 485, 491 (6th Cir. 2010) ("While discriminatory remarks can constitute direct evidence, they also serve as probative evidence of pretext."). "'[I]n evaluating the relevancy of discriminatory remarks' as part of a pretext analysis, '[courts] examine[] the identity of the speaker,' as well as 'the substance of the remarks.'" *Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 404 (6th Cir. 2008) (quoting *Hopkins v. Electronic Data Sys. Corp.*, 196 F.3d 655, 665 (6th Cir. 1999)). As noted, Vancobb was not a decisionmaker, and Aplin and Edmonds both testified that they thought that his remarks were made in jest. There is no evidence that Vancobb influenced Tate's decisionmaking, especially where management did not set out to terminate Henry, but only made that decision after hearing in their investigation that Henry was selling drugs. And the only evidence that Tate held any animus against Henry is Smith's comment that Tate "had it out" for Henry because she had been working there for a longer period of time. Even in the context of pretext, "discriminatory statements by a nondecisionmaker, standing alone, generally do not support an inference of discrimination[.]" *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356–57 (6th Cir. 1998)).

* * *

Defendants did not set out to investigate Henry, but in the course of investigating four younger employees for suspected drug activity, they heard from multiple people that Henry was selling drugs to other Outbackers. The management team took this information to higher-level HR within the company, and received authorization to terminate Henry. And after Henry—along with five younger employees—was terminated pursuant to this investigation, she confirmed to management that she was selling drugs pursuant to her medical marijuana card. And it has now come out in the summary-judgment record that Henry sold marijuana to Smith in the Outback parking lot at least once. Applying the standards for both direct and circumstantial evidence, no reasonable jury would find that Defendants' stated reasons for terminating Henry were a mere pretext for Defendants' intent to discriminate against Henry based on age. Accordingly, Defendants are entitled to summary judgment on this claim.

**B.**

Plaintiff's second claim is a state-law defamation claim. In Michigan, the elements of a defamation claim are as follows:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.

*Smith v. Anonymous Joint Enterprise*, 793 N.W.2d 533, 540 (Mich. 2010); *Ghanam v. Does*, 845 N.W.2d 128, 142 (Mich. Ct. App. 2014).

Here, Henry says that the statement at issue is a statement "that Plaintiff was fired for selling drugs." (R. 49, PID 1396.) But Henry does not identify the alleged speaker or the third party who heard the statement—indeed, in her amended complaint, she stated, "[t]he exact dates and recipients of all the defamatory statements are not known." (R. 25, PID 218.) Even now,

Henry's brief does not clarify this issue. This alone would likely be a sufficient basis to dismiss the claim. *See Whiting v. Allstate Ins. Co.*, 433 F. App'x 395, 398 (6th Cir. 2011).

Based on the record, the Court can only discern that Tate, Gudzik, and Vancobb communicated with Szewc and Toney-Pierce regarding the accusations against Henry. This is problematic for Henry because in Michigan, "An employer has a qualified privilege to defame an employee by publishing statements to other employees whose duties interest them in the subject. Employees responsible for hiring and firing are entitled to hear accusations of employee misconduct which warrant dismissal. . . ." *Merritt v. Detroit Mem'l Hosp.*, 265 N.W.2d 124, 127 (Mich. Ct. App. 1978). Thus, supervisory employees may "discuss . . . allegations, . . . make appropriate inquiries, and . . . commit their findings to writing" without violating defamation laws. *Cole v. Knoll, Inc.*, 984 F. Supp. 1117, 1134 (W.D. Mich. 1997) "How else could one run a company?" *Whiting*, 433 F. App'x at 398.

Henry does not dispute that Tate and the management team were responsible for the hiring and firing of hourly employees such as herself or that Szewc oversaw all of the Flint-area Outbacks, or that Toney-Pierce was an Employee Relations Manager. Thus, the Court concludes that the qualified privilege applies. *Tumbarella v. Kroger Co.*, 271 N.W.2d 284, 289 (Mich. Ct. App. 1978) ("The question of whether or not a privilege attaches under undisputed circumstances is a question of law for the judge." (citing *Lawrence v. Fox*, 97 N.W.2d 719 (Mich. 1959)).

Where a qualified privilege exists, a plaintiff "must prove actual malice in order to recover, *i.e.*, must prove that the communication was made with knowledge of its falsity or with reckless disregard for the truth." *Id.* (citations omitted); *see also Gonyea v. Motor Parts Fed. Credit Union*, 480 N.W.2d 297, 300 (Mich. Ct. App. 1991). Henry has not attempted to make such a showing on this record. To the contrary, the record shows that the management team

gathered information that Henry was selling drugs from multiple employees, and Henry herself ultimately confirmed that she sold drugs pursuant to her medical marijuana card.

Because Henry has not created a genuine issue of material fact to overcome Defendants' qualified privilege, Defendants are entitled to summary judgment.

## V.

Plaintiff has not raised a genuine issue of material fact regarding whether Defendants' stated reason for her termination—selling drugs—was a pretext for age discrimination. And Henry's defamation claim fails because she cannot overcome her employer's qualified privilege to communicate with authorized persons regarding a terminable event. Accordingly, IT IS ORDERED that Defendants' motion for summary judgment (R. 43) is GRANTED. It follows that this case is DISMISSED.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
Dated: April 18, 2017                                  U.S. DISTRICT JUDGE


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 18, 2017.

s/Keisha Jackson
Case Manager